# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Gertrude Nyanjega and Duba Roba,                Case No. 17-cv-1685 (SRN/SER)

          Plaintiffs,

v.                                              **REPORT AND**
                                                **RECOMMENDATION**

David Douglas, *District Director, USCIS,*
*St. Paul Field Office,* Leslie Tritten, *Field*
*Office Director,* Jeff Sessions, *Attorney*
*General,* Kirstjen M. Nielsen, *Secretary,*
*Department of Homeland Security,*[1]

          Defendants.

Gertrude Nyanjega and Duba Roba (*pro se* Plaintiffs); and

Friedrich A. P. Siekert, United States Attorney's Office (for Defendants).

        This matter comes before the Court, United States Magistrate Judge Steven E. Rau, on Defendants' Motion to Dismiss and for Summary for Judgment. (ECF No. 103).[2] This motion has been referred for a report and recommendation to the Honorable Susan Richard Nelson, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636. (ECF No. 111). Based on all the files, record, and proceedings herein, this Court recommends that Defendants' motion be granted and this matter be dismissed.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kirstjen M. Nielsen is substituted for Elaine Duke as Defendant.

[2] Plaintiffs' Motion to Compel Discovery, (ECF No. 97), is also considered herein due to its interrelatedness with Defendants' motion.

## I.    BACKGROUND

Duba Roba arrived in the United States in December 2010. Five months later, he married a woman he had met only two months prior. Roba married a woman 21 years his elder and who was married at least once previously for 21 years. This woman then filed an I-130 petition on Roba's behalf. Due to inconsistencies with the spouses' testimony, United States Customs and Immigration Services ("USCIS") began an investigation. Before that investigation concluded, in a two-week span Roba divorced the first woman and married anew. Roba'a new wife then filed an I-130 petition on Roba's behalf. Ultimately, USCIS concluded that Roba's first marriage was a sham marriage and that he was actually living with the new wife throughout his time in the United States. USCIS reached this conclusion based on the disparate inconsistencies revealed through the I-130 interviews, a site visit by USCIS Officers, and evidence gathered. Accordingly, the second I-130 petition was denied because of Roba's earlier marriage fraud. Plaintiffs' suit challenges the denial of the second I-130 petition on the grounds that Roba's first marriage was not fraudulent and that USCIS erred in its decision-making process.

### A. Immigration Framework

The Immigration and Nationality Act provides that a citizen or lawful permanent resident may petition on an alien spouse's behalf to classify the alien spouse as the petitioner's relative for visa purposes. 8 U.S.C. §§ 1153(a), 1154(a). The petitioning citizen or lawful permanent resident files a Form I–130, Petition for Alien Relative. 8 C.F.R. § 204.1(a)(1); 8 U.S.C. § 1154(a)(1)(A)(i). The burden is on the petitioning citizen or lawful permanent resident to establish eligibility of the alien spouse. 8 U.S.C. § 1361.

Once an I-130 is filed, USCIS investigates the petition and adjudicates it. 8 U.S.C. § 1154(b). The test for a *bona fide* marriage is whether, at the inception of the marriage, "the two parties have undertaken to establish a life together and assume certain duties and obligations." *Lutwak v. United States*, 344 U.S. 604, 611 (1953); *Matter of Laureano*, 19 I. & N. Dec. 1, 2–3 (BIA 1983) ("The central question is whether the bride and groom intended to establish a life together at the time they were married.").

"[N]o petition shall be approved" if USCIS has determined the "alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c); *accord* 8 C.F.R. § 204.2(a)(1)(ii) (USCIS "will deny a petition for immigrant visa classification filed on behalf of any alien for whom there is substantial and probative evidence of such an attempt or conspiracy . . ."). "A marriage entered into for the purpose of evading immigration laws thus precludes a beneficiary from ever receiving 'immediate relative' status from a subsequent I–130 petition." *Zemeka v. Holder*, 989 F. Supp. 2d 122, 129 (D.D.C. 2013); *Ghaly v. INS*, 48 F.3d 1426, 1435–36 (7th Cir. 1995) (under § 1154(c), an alien that "attempts or conspires to enter into a marriage for the purpose of evading the immigration laws . . . can never become a citizen of the United States or even reside permanently in this country"). "Where prior fraud is the basis for denying a subsequent I–130 petition, 'the district director should not give conclusive effect to determinations made in a prior proceeding, but, rather, should reach his own independent conclusion based on the evidence before him.'" *Zemeka*, 989 F. Supp. 2d at 129 (quoting *Matter of Tawfik*, 20 I. & N. Dec. 166, 168 (BIA 1990)).

If USCIS discovers evidence related to marriage fraud, it issues a Notice of Intent to Deny ("NOID") to the petitioning citizen or lawful permanent resident. 8 C.F.R. § 103.2(b)(8)(iv). The petitioner is afforded an opportunity to rebut. 8 C.F.R. § 103.2(b)(16)(i). The petitioner bears the burden of demonstrating the alien spouse's prior marriage was legitimate. *Zemeka*, 989 F. Supp. 2d at 130. Even if the alien spouse's "current marriage is unquestionably bona fide . . . the visa petition cannot be approved if the beneficiary sought to be accorded nonquota status based on a prior fraudulent marriage." *Matter of Kahy*, 19 I. & N. Dec. 803, 805 n.2 (BIA 1988). The District Director's decision may be appealed to the Board of Immigration Appeals ("BIA") then to the district court, "although USCIS's denial of an I–130 petition based on a finding of fraudulent marriage will stand if the record reveals a rational basis for the agency's decision." *Zemeka*, 989 F. Supp. 2d at 130 (quotation omitted).

## B.  Roba Enters the United States

Roba was born April 20, 1980 in Nairobi, Kenya. (Certified Admin. Record at 578, 325, ECF No. 79) (hereinafter "CAR"). Roba entered the United States on December 17, 2010 on a B-2 tourist visa. (CAR at 546, 333). Roba was to arrive in the United States via Worcester, Massachusetts in December 2010, visit the Grand Canyon, then depart from Worcester in January 2011. (CAR at 578). Roba's "friend," Gertrude Russell,[3] was paying for his trip to the United States. (CAR at 578). Roba reported he was staying with Gertrude at 28 Nutmeg Drive in Worcester, Massachusetts during his visit. (CAR at 578–79).

---

[3] Gertrude Russell is the previous name of Petitioner Gertrude Nyanjega. (CAR at 204, 201). For clarity, this Court will use "Gertrude" throughout.

4

### C.  Roba and Adan Marry; Adan Files an I-130 Petition on Roba's Behalf

On May 18, 2011, Roba married Madin Kassim Dula[4] in St. Paul, Minnesota. (CAR at 67, 306, 333, 303, 325). On July 27, 2011, Dula filed a Form I-130 on Roba's behalf. (CAR at 333–34, 68). Roba concurrently filed a Form I-485. (CAR at 485–90; *see* CAR at 303). Dula indicated she lived with Roba at 181 Mount Airy Street, Apt. A, St. Paul, Minnesota since they married. (CAR at 333–34). Dula changed her name to Safia Sheikh Adan several weeks later. (CAR at 344–45).

Adan and Roba were interviewed separately by a USCIS Officer on December 1, 2011 in connection with Adan's I-130 petition. (CAR at 68; *see* CAR at 326–31). Following review of the submitted materials and the interviews, USCIS found that "the entire record did not contain evidence which established bona fides of [Roba and Adan's] marriage." (CAR at 70). Due to lack of bona fides, as well as contradictions in Roba and Adan's testimony, USCIS initiated an investigation. (CAR at 70).

### D.  The Investigation of Roba and Adan's Marriage

With the I-130/I-485 applications, Ruba indicated he lived in Nairobi, Kenya through December 2010; 203 Norfolk Street in Gardner, Massachusetts from December 2010 through March 2011; 636 Rose Avenue in St. Paul, Minnesota from March 2011 through May 2011; and 181 Mount Airy Street in St. Paul from May 2011 through the date of the application (June 2011). (CAR at 303; *see* CAR at 325). In a document entitled "Application for Lease-On," dated August 5, 2011, Adan requested to add Roba to her

---

[4] Dula was born January 1, 1959. (CAR at 304, 215). She became a naturalized citizen on February 14, 2007. (CAR at 305).

lease at 181 Mount Airy Street. (CAR at 414, 71). Roba was listed as currently residing at 28 Nutmeg Drive, Worcester, Massachusetts. (CAR at 414, 71). Roba completed a "Public Housing Agency Application for Admission" three days later, listing the Worcester, Massachusetts address as his current address. (CAR at 418–21). But a document dated September 28, 2011 listed Roba's address as 636 Rose Avenue in St. Paul. (CAR at 336).

Adan's lease for 181 Mount Airy Street, signed August 16, 2011, did not list Roba as a member of her household. (CAR at 401, 71). On a form concerning emergency contacts and disposition of property dated August 16, 2011, Adan did not list Roba as an emergency contact or designee to receive belongings. (CAR at 429, 71). Adan again did not list Roba as an emergency contact or designee to receive belongings on forms dated September 7 and December 31, 2012. (CAR at 430, 346, 432). Leases signed by Adan in December 2012 did not list Roba as a member of her household. (CAR at 385, 393, 413, 71).

Roba applied for employment with Allied Barton on February 18, 2013. (CAR at 70, 109–16, 453–60, 567–68). Roba listed the following residential history: December 2010 to October 2012 at 203 Norfolk in Worcester, Massachusetts; October 2012 to February 2013 at 32 Cedar Street, Worcester, Massachusetts; and February 2013 at 181 Mount Airy in St. Paul, Minnesota. (CAR at 70, 109–10; *see* CAR at 587). Another submission showed a slightly different residential history: January 2012 to November 2012 at 203 Norfolk Street in Worcester, Massachusetts; November 2012 to January 2013 at 32 Cedar Street, Worcester, Massachusetts; and January 2013 to February 2013 at 181 Mount Airy in St. Paul, Minnesota. (CAR at 70, 117, 466). Roba's Massachusetts driver's license, issued May 21, 2012, listed his address as 203 Norfolk Street in Worcester, Massachusetts.

(CAR at 70, 470). Roba listed an employment history of: July 2012 to December 2012 at the Rhode Island Bureau of Investigations in Worcester, Massachusetts; and January 2013 to February 2013 at Command Security in Northborough, Massachusetts. (CAR at 70, 110–12). Roba listed Adan as his wife and emergency contact. (CAR at 472).

Roba completed an online rental application with Summit Park Apartments in Burnsville, Minnesota on March 6, 2013. (CAR at 70, 436–41, 568–69). Roba listed the following residential history: 203 Norfolk Street in Worcester, Massachusetts until October 2012; 32 Cedar Street in Worcester, Massachusetts from October 2012 through March 2013. (CAR at 70–71). Roba indicated he was employed by the Rhode Island Bureau of Investigations since January 2013. (CAR at 71). Roba listed Gertrude as his spouse. (CAR at 71, 440). Roba signed a lease for 12511 Portland Avenue South, #313, Burnsville, Minnesota beginning April 9, 2013. (CAR at 230–32, 443–45).

Gertrude completed a rental application with Summit Park Apartments in April 2013. (CAR at 447–49). Gertrude listed her current address as 32 Cedar Street, Worcester, Massachusetts. (CAR at 71, 449). Her Massachusetts's driver's license listed the same address. (CAR at 71). Gertrude listed Roba as her emergency contact but did not list their relationship. (CAR at 71). Roba added Gertrude as an occupant to the lease as a "relative-other." (CAR at 230).

Roba received a Minnesota driver's license on June 4, 2013. (CAR at 73, 575; *see* CAR at 234). Roba listed his address as 12511 Portland Avenue South, Apt. 313, Burnsville, MN. (CAR at 73). Gertrude obtained a Minnesota driver's license on June 10,

2013 listing the same address. (CAR at 73, 233, 574). Gertrude registered a vehicle to that same address on May 29, 2013. (CAR at 73, 577, 585).

On August 28, 2013, USCIS Officers conducted a site visit at 12511 Portland Avenue South, #313, Burnsville, Minnesota. (CAR at 71, 564). Gertrude answered the door, let the USCIS Officers in, and Roba was inside. (CAR at 71, 564). Roba stated he lived alone and was the only person on the lease. (CAR at 71–72, 564). Roba identified Gertrude as a friend that did not live in the apartment, but rather that she was visiting from St. Paul. (CAR at 72, 564–65). Roba told the USCIS Officers that Adan was in Kenya since January 2013 to care for her sick mother and had no scheduled return to the United States. (CAR at 72, 564). Roba reported that Adan was also in Kenya from February 2012 through September 2012 for the same reasons. (CAR at 72, 564). Because he had no friends in Minnesota and Adan was in Kenya, Roba relocated to Boston in February 2012. (CAR at 72, 564). During Adan's return to the United States from September 2012 through January 2013, she briefly stayed in Boston with Roba and also stayed in Minnesota. (CAR at 72, 564). Roba said Adan has three children. (CAR at 72, 564).[5] USCIS Officers observed mail addressed to Gertrude at the 12511 Portland Avenue South #313 address. (CAR at 72, 565). The apartment had two bedrooms, with Roba indicating he lived in the master bedroom. (CAR at 72, 565). Roba said only guests used the second bedroom and Adan's belongings were in the master bedroom. (CAR at 72, 565).

---

[5] During their interview with USCIS in December 2011, Roba and Adan each testified that Adan has ten children. (CAR at 68).

The USCIS Officers "confronted [Roba] with documentation that confirmed that [Gertrude] lived with him at the [12511 Portland Avenue] apartment, that she was on the lease, that her vehicle was registered to the apartment, and her driver's license listed the apartment address." (CAR at 72, 565). Roba "eventually acknowledged that [Gertrude] lived there but as a roommate because he could not afford the apartment by himself." (CAR at 72, 565–66). The USCIS Officers told Roba "there would have been no reason to lie to officers if [Gertrude] was indeed a platonic friend/roommate." (CAR at 72, 566).

Roba was asked where Gertrude kept her clothing, toiletries, and belongings. (CAR at 72, 566). Roba accused the USCIS Officers of "backing him into a corner." (CAR at 72, 566). Roba did not explain why Gertrude was identified as his spouse on the March 2013 rental application, where Gertrude kept her clothing, or where Gertrude slept. (CAR at 73, 566). Roba was repeatedly advised that the USCIS Officers' presence was voluntary, as was speaking to them and providing documentation. (CAR at 72–73, 565–66). The USCIS Officers informed Roba they could note his hesitance in their report. (CAR at 73, 566). Roba would not show where Gertrude kept her belongings. (CAR at 73, 566).

Roba and Adan divorced on September 10, 2013. (CAR at 74, 214–28).

Following this investigation, on October 8, 2013, USCIS issued a Statement of Findings ("SOF") that Roba committed fraud in his and Adan's I-130/I-485 applications. (CAR at 562). Specifically, the SOF noted Roba had been living with Gertrude since his 2010 arrival in the United States. (CAR at 562). The SOF found "it has not been established that ROBA and ADAN have resided in marital union at any time since their 2011 marriage. ROBA made numerous false statements during an FDNS site visit to the apartment he

shares with [Gertrude]." (CAR at 562, 74). Thus, USCIS concluded the marriage between

Adan and Roba was "a sham entered into solely to gain an immigration benefit for [Roba]."

(CAR at 74). This fraud finding "was based on numerous discrepancies in separate sworn

testimony, rental and employment documents obtained by subpoena, open source records,

and a site visit." (CAR at 74).

### E.   The Denial of Adan and Roba's I-130 and I-485 Application

On November 12, 2013, USCIS mailed Adan a NOID concerning her I-130

petition. (CAR at 74, 3, 294–302). USCIS received no response to the NOID. (CAR at 74,

3, 293). On December 20, 2013, Adan's I-130 petition was denied. (CAR at 74). Because

there was no underlying approved I-130 petition, Roba's I-485 application was denied on

December 27, 2013. (CAR at 74). Denial notices were mailed each to Adan and Roba on

February 6, 2014, copying their attorney of record, Daniel Brown. (CAR at 74, 3, 282–93,

493–94). No appeal followed.

### F.   Gertrude and Roba's I-130 and I-485 Application

On September 24, 2013, Roba and Gertrude married in Minneapolis, Minnesota.

(CAR at 74, 204, 212). On October 29, 2013, Gertrude filed an I-130 listing Roba as the

beneficiary. (CAR at 74, 3, 201–03).[6] Roba filed a concurrent I-485. (CAR at 497–503, 2).

On February 14, 2014, Gertrude and Roba appeared for an interview with USCIS,

testifying separately. (CAR at 74–76, 205–10). USCIS found "critical differences" in their

testimony. (CAR at 76). For example, Roba "was very reluctant to say that he had ever

---

[6] Gertrude had become a naturalized citizen on July 20, 2010. (CAR at 323, 211).

stayed with [Gertrude] prior to [their] shared residence in Minnesota" despite the fact he listed Gertrude "as the person he was coming to visit in the United States on his visa application." (CAR at 76). The record established that Gertrude and Roba "shared a number of residences and that for the majority of [Roba's] time in the United States, he has lived with [Gertrude.]" (CAR at 76). Gertrude and Roba had conflicting testimony concerning when they became romantically involved and when Roba proposed to Gertrude. (CAR at 76). Additionally, Adan signed an admission of service on August 4, 2013 and the agreement for marital termination on August 30, 2013, indicating that Roba had started the divorce process before USCIS Officers conducted their site visit. (CAR at 76; *see* CAR at 214–28). Roba "neglected to mention this pertinent information." (CAR at 76).

USCIS concluded that the "record is clear that [Roba] has provided false and inconsistent testimony in regards to his relationship with Ms. Adan. Minimal evidence has been submitted to reflect that they ever resided together or entered into the marriage in good faith." (CAR at 77). "After re-examining the entire body of evidence in this case, USCIS asserts that there is substantial and probative evidence to support the conclusion that the marriage between Ms. Adan and [Roba] was entered into for immigration purposes." (CAR at 77).

USCIS issued a NOID on May 21, 2014, advising Gertrude that the evidence supporting her I-130 petition was insufficient. (CAR at 77, 3–4, 188–99). The NOID specifically cited findings of a fraudulent marriage between Roba and Adan. (CAR at 77, 3–4). Gertrude, through counsel, submitted evidence in response to the NOID. (CAR at 77, 3; *see* CAR at 83–171). USCIS found the submitted evidence did not overcome the

discrepancies encountered during the interviews of Adan and Roba in December 2011, the interviews of Gertrude and Roba in February 2014, and the site visit in August 2013. (CAR at 78). USCIS also noted that Gertrude's relationship with Roba was not in question because the denial of Gertrude's I-130 petition on behalf of Roba was based on evidence regarding Roba's marriage to Adan. (CAR at 78). Thus, USCIS denied Gertrude's I-130 on February 9, 2016 on the grounds that Roba previously entered into a sham marriage to obtain immigration benefits. (CAR at 78). Roba's I-485 was also denied. (CAR at 475–83).

Gertrude, through counsel, appealed the decision to the BIA. (CAR at 5–6, 35–60). The BIA found the "facts of the present case reflect substantial and probative evidence that the prior marriage of the beneficiary to Ms. Adan was entered into for the purpose of evading the immigration laws." (CAR at 2). The BIA affirmed the decision to deny the visa petition and the appeal was dismissed. (CAR at 4).

### G. Nyanjega and Roba File Suit

Gertrude and Roba (collectively "Plaintiffs") brought suit on May 22, 2017. (Compl., ECF No. 1). Plaintiffs assert their claims arise under the Immigration and Nationality Act and the Administrative Procedures Act. (Compl. ¶ 1). Plaintiffs allege that, prior to making its decision on Adan's I-130 petition, USCIS failed to provide Roba a copy of its investigative report as required by 8 C.F.R. § 103.2(b)(16). (Compl. ¶¶ 10, 20–24). Specifically, Roba argues he has a "reasonable right to expect USCIS to notify him of any decision affecting him" especially given that his ex-wife had travelled out of the country and he notified USCIS of his ex-wife's absence. (Compl. ¶ 22). Essentially, Roba asserts

he never received the NOID for Adan's I-130 petition. (Compl. ¶ 24). Thus, Plaintiffs ask

the Court to "reverse the district director[']s decision to deny the first I-130 and approve

the current instant petition . . ." (Compl. ¶ 25).

Plaintiffs filed an Amended Complaint. (Am Compl., ECF No. 36). Plaintiffs assert

a Due Process violation in that USCIS violated 8 C.F.R. § 103.2(b)(2) by preventing Roba

from rebutting adverse evidence and failing to notify him prior to denying Adan's I-130

petition. (Am. Compl. ¶ 48). Plaintiffs assert USCIS's failure to permit Roba an

opportunity to rebut the evidence constituted an action that was "arbitrary, capricious and

[an] abuse of discretion." (Am Compl. ¶ 52). Plaintiffs argue USCIS erred in failing to

examine Roba's intent at the inception of marriage to Adan, rather than information in the

two to three subsequent years. (Am. Compl. ¶ 55). Plaintiffs also appear to challenge the

warrantless entry into the apartment by USCIS Officers during the site visit. (Am. Compl.

¶¶ 56–59). Plaintiffs ask that the Court reverse the denial of Adan's I-130 petition and

award damages. (Am. Compl. ¶ 60).

### H. The Instant Motions

Defendants have moved for summary judgment on Plaintiffs' claims concerning

denial of Gertrude's I-130 petition on the grounds that the denial was not arbitrary,

capricious, or unlawful and that substantial evidence supported the finding that Roba had

previously attempted to acquire an immigration benefit through marriage fraud. (ECF Nos.

103, 105). Defendants also moved to dismiss Plaintiffs' constitutional claims on the

grounds that the Court lacks jurisdiction. (ECF Nos. 103, 105). Plaintiffs argue that

summary judgment would be premature because discovery is incomplete. (ECF No. 113,

at 6–7). Moreover, Plaintiffs argue that the record precludes summary judgment because the Summit Park Apartments rental application Defendants refer to differs from that found in the record. (ECF No. 113, 7–9). Defendants reply that supplementation of the record is inappropriate.

This Court held a hearing on the parties' motions. (ECF No. 119). Plaintiffs submitted into evidence five documents: (1) a scanned image of an envelope from USCIS addressed to Adan at 181 Mount Airy Street that shows it was returned to sender; (2) a single page of handwritten notes from the USCIS site visit on August 28, 2013; (3) the cover page of Roba and Gertrude's lease with Summit Park Apartments for 12511 Portland Avenue; (4) a Federal Register publication and emails that appear to show Roba requested a status update as to the application; and (5) a scanned image that shows a letter from USCIS was returned to sender, but the intended recipient is not visible.

## II.   ANALYSIS

### A. Review of the I-130 Denial

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Courts may review whether agency actions, findings, and conclusions are, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983) (quotation omitted). "The arbitrary and capricious standard is a narrow one that reflects the deference given to agencies' expertise within their respective fields." *Henry v. U.S. Dep't of Navy*, 77 F.3d 271, 272 (8th Cir. 1996); *Judulang v. Holder*, 565 U.S. 42, 53 (2011). When considering whether a decision was made in accordance with the law, "to reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (emphasis in original).

### 1.    The Denial was in Accordance with the Law

Plaintiffs' main argument is that Roba never received the NOID concerning Adan's I-130.[7] Plaintiffs cite to 8 C.F.R. § 103.2(b)(2) in their Amended Complaint, (Am. Compl. ¶¶ 48–49), but that regulation concerns submitting secondary evidence and affidavits.[8] The language Plaintiffs quote in conjunction with their claim, however, comes from 8 C.F.R. § 103.2(b)(16).[9] Under § 103.2(b)(16), a petitioner "shall be permitted to inspect the record of proceeding which constitutes the basis for the decision." If the USCIS's

> decision will be adverse to the applicant or petitioner and is based on derogatory information considered by the Service and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered . . .

---

[7] While Plaintiffs reference the Due Process Clause, this Court understands their claim to arise under the Administrative Procedures Act given the regulatory citations and the assertion that USCIS failed to provide an opportunity to respond that amounted to arbitrary and capricious action. (Am. Compl. ¶¶ 47–53). This is further buttressed by Plaintiffs' initial Complaint, which cites to the Administrative Procedures Act. (Compl. ¶ 1, 18).

[8] For example, this regulation covers when required evidence, such as a birth or marriage certificate, "does not exist or cannot be obtained," allowing the applicant or petitioner to demonstrate its unavailability and "submit secondary evidence, such as church or school records, pertinent to the facts at issue." 8 C.F.R. § 103.2(b)(2)(i). It also prescribes the means for demonstrating that a government record is unavailable. 8 C.F.R. § 103.2(b)(2)(ii).

[9] Plaintiffs cited to 8 C.F.R. § 103.2(b)(16) in their initial Complaint. (Compl. ¶¶ 10, 21).

8 C.F.R. § 103.2(b)(16)(i). "Any explanation, rebuttal, or information presented by or in

behalf of the applicant or petitioner shall be included in the record of proceeding." *Id.*

     A NOID was mailed to Adan at her last known address of 181 Mount Airy Street

on November 12, 2013. (CAR at 294). The NOID was also sent to Adan's attorney of

record. (CAR at 302). Following seven full pages of evidentiary information, the NOID

clearly stated:

> In accordance with 8 CFR 103.2(b), you are hereby given thirty (30) days
> from the date of this letter (33 days if this notice is mailed) to inspect the
> evidence in this case and offer evidence in rebuttal. If no explanation,
> rebuttal, or evidence is received within the time given, the case will be
> decided on the present evidence.

(CAR at 302). Adan did not respond, either individually or through her attorney. (*See* CAR

at 282). Adan's I-130 was denied on February 6, 2014. (CAR at 282). The denial noted the

following:

> On November 12, 2013, the Service issued you a [NOID]. The Notice was
> mailed to your address of record: 181 Mount Airy Street #A, St. Paul, MN
> 55130. You testified to living at this address at your December 1, 2011
> Service Interview. Service records establish that you have not notified the
> Service of a change of address. The Service does recognize that the
> beneficiary changed his address of record on September 2, 2012.
>
> On November 20, 2013, the U.S. Postal Service returned the envelope that
> contained the NOID as "return to sender." The Service finds that you have
> failed to submit any documentation to overcome the evidence in the record
> which clearly supports a finding that you and the beneficiary entered into a
> sham marriage.

(CAR at 293). The denial was sent to Adan at her last known address of 181 Mount Airy

Street, as well as to her attorney of record. (CAR at 282–83; *see* Pls.' Ex. 1). The denial

included information concerning appealing the decision. (CAR at 282). Roba was likewise

notified that his I-485 application was denied because Adan's I-130 petition was denied. (CAR at 493–94). This denial was mailed to Roba's 30 Cedar Street address in Worcester, Massachusetts, as well as to Roba's attorney of record. (CAR at 493–94).

Roba argues that USCIS mailed Adan's NOID to the 181 Mount Airy address knowing that Adan did not live there. Roba cites to his address change and the August 2013 site visit where he discussed Adan's travels outside the country as evidence of USCIS's nefarious intentions to deny him the opportunity to contest the I-130's denial. Roba's argument is misplaced. Under 8 C.F.R. § 204.2(a)(3), denials of I-130 petitions are sent to the *petitioner*. Adan was the petitioner, not Roba, he was only the *beneficiary* of Adan's I-130 petition. As such, Adan was the only party entitled notice concerning her I-130 petition. *See Matter of Sano*, 19 I. & N. Dec. 299, 300 (BIA 1985) (holding that only a petitioner can appeal the denial of a visa petition). Moreover, Adan and Roba were each represented by the same attorney, Daniel Brown, who received all the notices—the November 12, 2013 NOID and the February 6, 2014 I-130 and I-485 denials. The record shows USCIS complied with 8 C.F.R. § 103.2(b)(16)(i) and allowed Adan an opportunity to respond. The fact that Adan was out of the country and failed to notify USCIS of her current mailing address does not render the USCIS's actions unlawful, particularly where Adan's attorney received simultaneous notice. Thus, this Court concludes Plaintiffs cannot show Defendants' decision was not in accordance with the law, 5 U.S.C. § 706(2)(A), much less that another decision is compelled by the record, *Elias-Zacarias*, 502 U.S. at 481 n.1.

Turning to Gertrude's I-130 petition, there is no dispute that Gertrude received the NOID mailed May 21, 2014. (CAR at 188). This NOID included the following:

> On November 12, 2103, USCIS mailed Ms. Adan a Notice of Intent to Deny (NOID) the I-130 petition listing Duba Roba as the beneficiary. USCIS did not receive a response to the NOID and on December 20, 2013, the I-130 was denied. Lacking an underlying approved petition, the I-485 filed by Duba Roba on July 27, 2011 was denied on December 27, 2013. On February 6, 2014, a denial notice was mailed to Ms. Adan regarding her petition and a separate denial notice was mailed to Duba Roba regarding his application.

(CAR at 195). Gertrude, through counsel, submitted a rebuttal to the NOID. In that rebuttal, the only discussion of defects pertaining to the Adan NOID were that it was sent to Roba's "former wife's address when she was outside of the United States," and that the current NOID "demonstrates that the Service has failed to accurately review the record." (CAR at 88; *see* CAR at 104 (Roba's attached affidavit claiming *he* did not receive the NOID, but rather that it went to Adan's address and she was out of the country)). USCIS considered all the evidence submitted by Gertrude, through her attorney, in response to the NOID, but ultimately found it did not overcome the discrepancies encountered during the interviews of Adan and Roba in December 2011, the interviews of Gertrude and Roba in February 2014, and the site visit in August 2013. (CAR at 78). Gertrude, through counsel, appealed the decision to the BIA, which affirmed the denial. Thus, because Gertrude clearly received the NOID and was provided a chance to rebut, Plaintiffs have not shown that Defendants' decision was not in accordance with the law, 5 U.S.C. § 706(2)(A), much less that another decision is compelled by the record, *Elias-Zacarias*, 502 U.S. at 481 n.1.

### 2.     The Denial was Not Arbitrary or Capricious

The USCIS's decision that Roba and Adan entered into a sham marriage is supported by substantial and probative evidence. 8 C.F.R. § 204.2(a)(1)(ii). The record is replete with evidence that Roba lived with Gertrude since his 2010 arrival in the United States. The documents completed by Roba when applying for employment with Allied Barton and for housing at Summit Park Apartments contain essentially identical residential histories: Roba lived in Massachusetts from his December 2010 arrival into the United States through early 2013 when he relocated with her to Minnesota. The documents Roba submitted to USCIS, however, tell a different story. Roba asserted he was in Massachusetts only from December 2010 through March 2011, and was then in Minnesota from March 2011 through June 2011 (the date of the application). While Roba asserts he was approved to join Adan's lease at the Mount Airy Street apartment, (ECF No. 67), ultimately, Adan never added Roba to her several Mount Airy Street leases. This runs against Adan's testimony that Roba resided with her at the Mount Airy Street apartment and Adan's I-130 which listed Roba as residing at the Mount Airy Street apartment. Despite supposedly living together as husband and wife, Adan never listed Roba as an emergency contact or designee to receive her belongings. This housing history supplied by Roba and Adan to USCIS is further contradicted by submissions showing Roba listed his address as 28 Nutmeg in Worcester in July 2011. (CAR at 414, 418–21).

Shortly after the I-130 interview, Adan left the United States in February 2012 to care for her sick mother. She was gone through September 2012. Adan returned briefly, then left again in January 2013 where she remained out-of-country through at least August

2013. According to his self-provided residential history to Allied Barton and Summit Park Apartments, Roba was already residing in Massachusetts at the time Adan departed the United States. While Roba claimed he and Adan split time between Massachusetts and Minnesota from September 2012 through January 2013 on Adan's brief return, Roba's residential history never reflects this. Instead, Roba changed addresses within Massachusetts from 203 Norfolk in Gardner to 32 Cedar Street in Worcester. All were addresses he shared with Gertrude.

There were many inconsistencies in Adan and Roba's separate interviews. Adan testified she had a relationship with Hussein Boru and bore two children. (CAR at 68). Adan testified she married once in 1978 in Ethiopia to Guye Boru and bore eight children. (CAR at 68). Roba testified Adan married a man named "Guyo" who lived in St. Paul and that he had possibly seen him at community meetings. (CAR at 68). Roba also testified that Adan had been married to a man named Hussein. (CAR at 68). When pressed by the USCIS Officer, Roba insisted Adan was married once, but "named two previous spouses," asserting that Hussein and Guyo were not the same person. (CAR at 68). Roba testified that Hussein fathered two of Adan's children and did not know who fathered the other eight. (CAR at 68).

Roba did not know when Adan came to the United States; Adan testified she arrived in 2003 as a refugee with her children. (CAR at 68). Adan testified she divorced Guye in 2005 in Minnesota; Roba testified the divorce occurred in 2008. (CAR at 68). Adan testified that seven of her children live in Minnesota, one in South Dakota, one she does not know the whereabouts, and one died in 2009; Roba testified that he has met two

20

children that live with Adan, but does not know the names or whereabouts of her other children. (CAR at 68). Adan testified that Roba came to visit a friend in the United States, but that she did not know the friend nor where the friend lived, but guessed that it was a woman. (CAR at 68). Adan knew Roba's sponsor only as "the lady." (CAR at 69). Adan testified that Roba was living in Seattle with family when she first met him. (CAR at 68). Roba testified that, after living in Boston for three months, he lived in Seattle for two months with a friend. (CAR at 68). Roba never listed a Seattle address in the application materials.

Adan testified that after meeting Roba in Seattle, she invited him to St. Paul in April 2011 where he stayed with her at the 181 Mount Airy Street apartment; Roba testified he stayed with a friend at 636 Rose Avenue while visiting Adan in St. Paul. (CAR at 69). Adan testified she did not know how many siblings Roba has; Roba testified he has one brother and one sister. (CAR at 69). Adan did not know if Roba had any family in the United States. (CAR at 69). Adan testified she was unemployed, but met with a county job counselor and had applied for jobs; Roba testified Adan had not applied for jobs. (CAR at 69). The parties did not submit any evidence concerning joint ownership of property or commingling of financial resources. (CAR at 69).

Roba and Adan began divorce proceedings in August 2013, before the USCIS site visit. Despite having initiated the divorce process, Roba maintained to USCIS Officers that he and Adan were still married and cohabitating. Roba first insisted that Gertrude was visiting from St. Paul, but when confronted with contradictory evidence, Roba maintained that Gertrude was a platonic roommate. Roba refused to show where Gertrude kept her

belongings and continued to assert the secondary bedroom was only used when guests visited. This is despite the fact that over five months earlier, Roba listed Gertrude as his spouse in a residential application with Summit Park Apartments. Gertrude had registered her Minnesota driver's license and a vehicle to that address in May and June 2013. Roba and Adan's divorce became official on September 10, 2013. Two weeks later, Roba and Gertrude were married.

Roba's second USCIS interview did not go well either. Despite significant evidence in the record indicating their shared residences, Roba "was very reluctant to say that he had ever stayed with [Gertrude] prior to [their] shared residence in Minnesota" despite the fact he listed Gertrude "as the person he was coming to visit in the United States on his visa application." (CAR at 76). Roba and Gertrude had conflicting testimony as to when they became romantically involved and when marriage was contemplated.

Gertrude, through counsel, challenged the determination that substantial and probative evidence supported the conclusion that Adan and Roba entered into a sham marriage for immigration purposes. USCIS discussed the submitted evidence. (CAR at 77–78). USCIS ultimately concluded that the evidence submitted, "when considered in its totality, cannot overcome the discrepancies that were encountered during the interviews of December 1, 2011, February 14, 2014, and site visit on August 28, 2013." (CAR at 78). Thus, since USCIS concluded that Roba previously entered into a sham marriage, it could not approve Gertrude's I-130 on Roba's behalf. Gertrude had the opportunity to contest this decision on appeal and it was affirmed by the BIA.

When making a determination concerning marriage fraud, "the district director should not give conclusive effect to determinations made in a prior proceeding, but, rather, should reach his own independent conclusion based on the evidence before him." *Matter of Tawfik*, 20 I. & N. Dec. at 168. USCIS did as required. It did not merely rely upon the denial of Adan's I-130 petition when denying Gertrude's I-130 petition, but instead conducted a renewed evaluation of Adan and Roba's marriage, including the new information garnered from Gertrude's I-130 petition. USCIS considered the evidence of Adan and Roba's marriage and Gertrude's rebuttal information in response to the NOID, again concluding that Adan and Roba entered into a sham marriage. There is nothing arbitrary or capricious about USCIS's decision to deny Gertrude's I-130 petition. 5 U.S.C. § 706(2)(A). USCIS examined the relevant facts, considered additional facts submitted by Gertrude through her counsel, and articulated a satisfactory explanation for its finding that Roba and Adan entered into a sham marriage, disqualifying Roba from future immigration benefits. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (1983). This decision was supported by substantial and probative evidence.

The evidence Roba seeks to insert would not alter this decision. Roba argues that Gertrude's full Summit Park Apartments application is not part of the record. The record contains documents Summit Park Apartments provided to USCIS. (CAR at 436–49). On the fax cover sheet, it notes "Gertrude Russell (listed as spouse) was added as an occupant 5/1/13." (CAR at 436). Those documents include Gertrude's driver's license, (CAR at 446), a background check on Gertrude, (CAR at 447–8), and a one-page application form

23

for Gertrude, (CAR at 449).[10] While his argument is unclear, Roba appears to contest the discrepancy wherein Summit Park Apartments' cover letter indicates an enclosed 11 pages, while the corresponding portion of the Certified Administrative Record spans 13 pages. Roba argues this discrepancy raises questions of authenticity of the two extra pages. Roba's argument lacks merit. He argues that Gertrude's full application is not in the record while at the same time arguing that the record contains too many documents from Summit Park Apartments. Simultaneously, Roba argues that USCIS relied on extra-record evidence concerning the Summit Park Apartments application. Roba fails to identify what the extra-record evidence is, however, and this Court cannot identify it from the USCIS decisions. Most importantly, though, Roba does not articulate how anything pertaining to the Summit Park Apartments application concerning *Gertrude* affects USCIS's decision that he entered into a sham marriage with *Adan*.

Similarly, Roba argues that the USCIS Officers' handwritten notes from the August 2013 site visit, (Pls.' Ex. 2), show that they knew the female occupant to be Gertrude and thus were lying when they asked Roba to identify her. The USCIS Officers clearly already knew the identity of Gertrude before the site visit because they confronted Roba with evidence contradicting his statements that she did not live there. The fact that USCIS Officers feigned ignorance as to Gertrude's identity does not render USCIS's decision concerning Adan and Roba's marriage arbitrary and capricious. Moreover, the sparse

---

[10] It also includes Roba's background check, (CAR at 437–39), application (CAR at 440–41), electricity transfer order, (CAR at 442), and initial lease, (CAR at 443–45)

handwritten notes are memorialized more fully in the Statement of Findings already in the record. (CAR at 564–67).

Roba submitted a document that he claims shows Gertrude was added to his Summit Park Apartments lease in 2015. (Pls.' Ex. 3). This document, however, is already in the record. (CAR at 230). More importantly, this document shows a lease dated October 23, 2013 that adds Gertrude as an occupant, contradicting Roba's assertion. (CAR at 230). Additionally, the Summit Park Apartments fax cover letter, sent on August 2, 2013, indicates Gertrude was added as an occupant on May 1, 2013. (CAR at 436).

Roba submitted a document with various components. First, it contains a Federal Register publication. (Pls.' Ex. 4, at 1–2). Under that publication, the Department of Homeland Security reported that it was "amending its regulations governing when U.S. Citizenship and Immigration Services (USCIS) will issue correspondence, notices of decisions, and documents evidencing lawful status in the United States to an applicant, petitioner, attorney, or accredited representative." Notices of Decisions and Documents Evidencing Lawful Status, 79 Fed. Reg. 64299 (Oct. 29, 2014). Attached to this Federal Register publication are documents that Roba has already submitted to the Court, (ECF No. 67-2), which relate to his request for a status update as to his application, (Pls. Ex. 4, at 3–5). These documents appear to relate to the March 4, 2013 interview notice scheduled in Worcester, Massachusetts that Roba asked to be rescheduled due to Adan's travels outside the country. (*See* CAR at 596–97). Also related to that notice, Roba submitted documents concerning letters that were returned as undeliverable, (Pls.' Ex. 5), that are an amalgamation of items already in the record, (CAR at 590–91). These documents are

irrelevant, as Roba and Adan attended their interviews with USCIS and, as discussed herein, Adan never updated her address and she, not Roba, was the person entitled to notice. None of these documents affect in any way the Court's determination that the USCIS's decision concerning Adan and Roba's marriage was not arbitrary and capricious.

Simply put, the record and its underlying facts do not support Plaintiffs' theory of the case. USCIS made an investigation into Roba and Adan's marriage after their in-person interviews revealed significant inconsistencies. That investigation revealed that Roba was living with Gertrude through the duration of his stay in the United States, rather than with his supposed wife, Adan. When confronted with this information, Roba provided conflicting explanations. The interviews of Roba and Gertrude provided even further inconsistencies. None of the evidence that Roba asserts is missing from the record has any effect whatsoever on the determination that his marriage to Adan was for the purposes of gaining an immigration benefit. Adan and her counsel never challenged the denial of her I-130 petition. Those underlying facts were evaluated anew when Gertrude submitted her I-130 petition, and the denial was contested by Gertrude, through counsel, at both the initial determination at the district level and on appeal to the BIA. These processes or decisions were not contrary to law and they were not arbitrary or capricious. The decision that Adan and Roba entered into a sham marriage is supported by substantial and probative evidence. Accordingly, USCIS was required to deny Gertrude's I-130 petition on Roba's behalf. 8 U.S.C. § 1154(c); 8 C.F.R. § 204.2(a)(1)(ii).

### B. No Jurisdiction Over Plaintiffs' Constitutional Claims

Plaintiffs argue that the USCIS Officers violated their Fourth Amendment rights when they conducted the site visit. The Court has no jurisdiction over these claims.[11]

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted). "Sovereign immunity is jurisdictional in nature." *Id.* Because "[f]ederal courts are courts of limited jurisdiction, the 'threshold requirement in every federal case is jurisdiction.'" *Bradley v. Am. Postal Workers Union, AFL-CIO*, 962 F.2d 800, 802 n.3 (8th Cir. 1992) (quoting *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987)); *Fed. Deposit Ins. Corp.*, 510 U.S. at 475. The burden of proving subject matter jurisdiction falls on a plaintiff who "must show both a waiver of sovereign immunity and a grant of subject matter jurisdiction." *V S Ltd. P'ship v. Dep't of Hous. and Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000).

Plaintiffs point to no waiver of sovereign immunity or grant of subject matter jurisdiction concerning their constitutional claims. In their Amended Complaint, Plaintiffs cite to 28 U.S.C. § 1331. (Am. Compl. ¶ 2). "Section 1331 is merely a jurisdictional statute that does not create any substantive rights that may be enforced against the United States for money damages." *Hagemeier v. Block*, 806 F.2d 197, 203 (8th Cir. 1986). Likewise, Plaintiffs' reference to 42 U.S.C. § 1983 is misplaced, as that authority only relates to

---

[11] Plaintiffs also argue that the USCIS Officers violated 42 U.S.C. § 1983, the Fourteenth Amendment, and the Minnesota Constitution. (Am. Compl. ¶¶ 1, 58). Since the USCIS Officers are federal agents acting under federal authority, these authorities do not apply.

persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia," not the United States government. Because Plaintiffs have failed to identify any waiver of sovereign immunity by the United States and a grant of subject matter jurisdiction over the claims presented by Plaintiffs, Plaintiffs constitutional claims must be dismissed.[12] As evidenced above, however, the Court does have jurisdiction to review the denial of Gertrude's I-130 petition. *Ginters v. Frazier*, 614 F.3d 822, 827–29 (8th Cir. 2010).

### C.  Plaintiffs' Motion to Compel

Plaintiffs move to compel "a digitized copy of [Roba's] USCIS A-File" and for an order permitting the deposition of the two USCIS Officers who conducted the August 2013 site visit. (ECF No. 97). As Plaintiffs note, they seek to depose the USCIS Officers on the basis of the Summit Park Apartments evidence and their entry into the residence. (ECF No. 97, at 2).

First, the record is already composed of Roba's A-File. (Decl. of Shauna Harrison ¶ 8, ECF No. 99). Thus, Plaintiffs' motion appears moot with respect to the A-File request. Further, the I-130 petitions pertain to Adan and Gertrude, with Roba only serving as their beneficiary, rendering Plaintiffs' argument concerning Roba's submission of a change of address unavailing for the reasons stated above. Second, for the reasons discussed above, Plaintiffs' arguments concerning the Summit Park Apartments documents in the record are

---

[12] If this Court were to consider Plaintiffs' claims, it would find that they lack merit. While Plaintiffs assert the USCIS Officers "found their way in uninvited," (Am. Compl. ¶ 36), the only evidence before the Court shows that Gertrude let the USCIS Officers into the apartment and the USCIS Officers repeatedly advised Roba and Gertrude that their presence was voluntary, (CAR at 72–73, 564–66).

unavailing and the Court lacks jurisdiction over Plaintiffs' claims concerning the entry into the residence by the USCIS Officers.

Most importantly, however, is that when a court reviews an agency decision under the Administrative Procedures Act, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "The task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Here, Plaintiffs' arguments concerning the record presented do not evince any extraordinary circumstances that would permit discovery. Accordingly, this Court recommends Plaintiffs' motion be denied.

[Continued on next page.]

## III.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** as follows:

1.  Defendants' Motion to Dismiss and for Summary for Judgment, (ECF No. 103), be

    **GRANTED**.

2.  Plaintiffs' Motion to Compel Discovery, (ECF No. 97), be **DENIED**.


Dated: December 4, 2018                    _____*s/ Steven E. Rau*_____
                                           Steven E. Rau
                                           United States Magistrate Judge
                                           District of Minnesota

                                           *Nyanjega, et al. v. Douglas, et al.*
                                           Case No. 17-cv-1685 (SRN/SER)


## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgement of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).